# EXHIBIT 1

Jason Flanders (Bar No. 238007)
AQUA TERRA AERIS LAW GROUP LLP
828 San Pablo Ave., Ste. 115B
Albany, CA 94707
Phone: 916-202-3018
Email: jrf@atalawgroup.com

*Attorneys for Plaintiff*
ECOLOGICAL RIGHTS FOUNDATION

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, a California non-profit association,<br><br>Plaintiff,<br><br>v.<br><br>SIERRA PACIFIC INDUSTRIES, INC,<br><br>Defendant. | Civil Case No.:<br><br>**SETTLEMENT AGREEMENT**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

**WHEREAS,** Plaintiff Ecological Rights Foundation (hereinafter "ERF") is a non-profit association dedicated to protecting California surface waters from pollution and degradation, among other objectives.

**WHEREAS,** Defendant SIERRA PACIFIC INDUSTRIES, INC. (hereinafter "SPI" or "Defendant") previously owned and/or operated an industrial facility located at 2593 New Navy Base Road, Arcata, CA 95521, consisting of a sawmill, log yard, lumber yard, boiler, retention pond, log deck, historical dip tank area, and various storage and oil sheds; the facility ceased operations in April 2016, after which equipment, materials, and other items were removed, and the property was subsequently sold in December 2016 (collectively, the "former Facility");

**WHEREAS,** ERF and SPI shall be individually referred to as a "Party" and collectively referred to as the "Parties;"

**WHEREAS,** due to historical site conditions described below, SPI continues to collect and discharge storm water from the footprint of the former Facility east into the Mad River Slough, which is connected to Humboldt Bay, and west to an unnamed wetland that drains into Humboldt Bay (a map of the former Facility is attached hereto as Exhibit A and incorporated herein by reference);

**WHEREAS,** the storm water discharges associated with previous industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 14-57-DWQ (hereinafter "General Permit"); and, prior to July 1, 2015, were regulated by Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order 92-12-DWQ and 97-03-DWQ; each of which was issued pursuant to Section 402(p) of the Clean Water Act (the "Act" at 33 U.S.C. §§ 1251, *et seq.*), 33 U.S.C. §1342(p);

**WHEREAS,** non-storm water discharges associated with sprinkler water runoff were previously regulated pursuant to NPDES Individual Permit No CA0024520, California Regional Water Quality Board, North Coast Region, ("Regional Board") Order No. R1-2012-0046;

**WHEREAS,** the former Facility is subject to Clean-up and Abatement Order No. R1-2003-0127, issued by the Regional Board, dated November 13, 2003 (the "2003 Order"), which requires SPI to abate conditions at the former Facility contributing to discharges of petroleum hydrocarbons,

1   pentachlorophenol, tetrachlorophenol, and other toxic compounds; SPI previously completed the

2   remedial work it proposed and was approved, though longer-term reporting and monitoring

3   requirements set forth in the 2003 Order continue.

4          WHEREAS, on or about March 14, 2003, the Parties entered into a Consent Decree in order to

5   resolve a lawsuit brought by ERF alleging violations of the Clean Water Act at the former Facility in

6   *Ecological Rights Foundation v. Sierra Pacific Industries* (N.D. Cal. Case No. C-01-0520 MEJ) (the

7   "2003 Consent Decree");

8          WHEREAS, on or about November 10, 2016, ERF provided notice of SPI's alleged violations

9   of the Act ("Notice Letter"), and of its intention to file suit against SPI to the Administrator of the

10  United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the

11  U.S. Attorney General; the Executive Director of the State Board; the Executive Officer of the Regional

12  Water Quality Control Board, North Coast Region ("Regional Board"); and to SPI, as required by the

13  Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of ERF's Notice Letter is attached as Exhibit B

14  and incorporated herein by reference);

15         WHEREAS, on or about August 25, 2017, ERF filed a complaint ("Complaint") against SPI in

16  the United States District Court, Northern District of California, ("District Court") (referred to as "the

17  Action");

18         WHEREAS, SPI denies the occurrence of the violations alleged in the Notice Letter and Action,

19  and maintains that SPI has complied at all times with the provisions of the General Permit and the Act

20  or, alternatively, that there are no "ongoing and continuous" violations of the General Permit or the Act;

21         WHEREAS, the Parties agree that it is in their mutual interest to resolve the Notice Letter and

22  Action as to all entities and persons named therein without litigation and enter into this Settlement

23  Agreement ("Agreement");

24         WHEREAS, for purposes of this Agreement only, the Parties stipulate that venue is proper in

25  the U.S. District Court, Northern District of California, ("District Court") and that SPI does not contest

26  the exercise of jurisdiction by the District Court; and

27         WHEREAS, within five (5) calendar days of the Effective Date, this Agreement shall be

28  submitted by ERF to the United States Department of Justice for a 45-day statutory review period,

1   consistent with 33 U.S.C. § 1365(c) and 40 C.F.R. § 135.5.

2        **WHEREAS**, at the time the Agreement is submitted for statutory review to the United States

3   Department of Justice, ERF shall submit a Notice of Settlement to the District Court and inform the

4   Court of the expected dismissal date following the expiration of the statutory review period identified

5   above;

6        **AND WHEREAS**, upon expiration of the statutory review period, or the earlier receipt of non-

7   objection from the United States Department of Justice, the Parties shall file within ten (10) calendar

8   days with the District Court a Stipulation and Order that shall provide that the Complaint and all claims

9   therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2)

10  concurrently with the District Court's retention of jurisdiction for the enforcement of this Agreement as

11  provided herein (the date of entry of the Order to dismiss shall be referred to herein as the "Court

12  Approval Date").

13       **NOW THEREFORE IT IS HEREBY STIPULATED BY AND BETWEEN THE**

14  **PARTIES AS FOLLOWS:**

15  **I.    COMMITMENTS OF DEFENDANT SPI**

16       1.    **Compliance with General Permit and Clean Water Act**. Throughout the term of this

17  Agreement, SPI shall continue implementing all measures necessary for the former Facility to comply

18  with the requirements of the operative General Permit and the Act, subject to any defenses available

19  under the law.

20       2.    **Implementation of Specific Storm Water Best Management Practices**. On or before

21  September 15, 2017, SPI shall continue, maintain, and/or complete the implementation, and

22  incorporation into the former Facility's Storm Water Pollution Prevention Plan ("SWPPP"), of the

23  following storm water source control measures/best management practices ("BMPs") at the former

24  Facility:

25       a.   SPI shall comprehensively clean all impervious surfaces in the drainage area of SL-4,

26            including heavy sweeping;

27       b.   SPI shall increase settling times in the retention pond by extending the riser pipe by one

28            foot to address flows leading to SL-7;

c.   SPI shall add wattles to the channel leading from the existing retention pond to SL-7; and

d.   SPI shall maintain existing wattles and socks at SL-1 and better place them in channel to more effectively intercept flow.

3.   **Sampling Frequency**. For the 2017-2018 reporting year, and 2018-2019 reporting year if applicable[1], ending on June 30th of 2018 and 2019, respectively, SPI shall collect and analyze samples from three (3) Qualifying Storm Events[2] ("QSEs") within the first half of each reporting year (July 1 to December 31), and 3 QSEs within the second half of each reporting year (January 1 to June 30), provided 3 QSEs occur at the former Facility during each half of the reporting year.  For each sample obtained, SPI shall adhere to all necessary preservation methods and holding time limits for the subject constituents. Any sampling frequency beyond the 2018-2019 reporting year shall be pursuant to the General Permit, if applicable.

4.   **Sampling Parameters**. All QSEs samples in each reporting year shall be analyzed for each of the constituents listed in the former Facility SWPPP and 2003 Order (including pentachlorophenol and dioxins), by a laboratory accredited by the State of California. Analytical methods used by the laboratory shall comply with General Permit requirements in regards to both test method and detection limit. *See* General Permit, Table 2, at 43. Samples must be unfiltered and analyzed by EPA Method 1613 for tetra through octa chlorinated dibenzo dioxins and furans. The Toxic Equivalency (TEQ) shall be calculated using the 2005 World Health Organization's (WHO's) toxic equivalency factors (TEFs). All SPI storm water sampling results shall be provided to ERF within seven (7) business days of SPI's receipt of the laboratory report from each sampling event, pursuant to the Notice provisions below

5.   **"Action Memorandum" Trigger; ERF Review Of "Action Memorandum"; Meet-and-Confer**. If any sample or samples taken during any of the reporting years referenced in Paragraph 3 above exceeds the Action Memorandum Evaluation Levels set forth in Exhibit C, or if SPI fails to collect and analyze samples from the minimum requisite QSEs (provided the requisite QSEs occur at

---

[1] Sampling obligations in the 2018-2019 reporting year under this Agreement cease if termination pursuant to Paragraph 20 occurs.

[2] A Qualifying Storm Event (QSE) is defined in the General Permit as a precipitation event that: (a) produces a discharge for at least one drainage area; and (b) is preceded by 48 hours with no discharge from any drainage area. *See* General Permit, Section XI(b)(1).

the former Facility), then SPI shall prepare a written statement discussing the exceedance(s) and/or inability or failure to collect and analyze samples from requisite QSEs, the possible cause and/or source of the exceedance(s), and additional measures that will be taken to address and eliminate future exceedances and/or failures to collect required samples ("Action Memorandum"). The Action Memorandum shall be provided to ERF not later than July 15, 2018 and/or July 15, 2019, if applicable.[3]  Such additional measures, to the extent feasible, shall be implemented immediately, and in no event later than sixty (60) calendar days after the due date of the Action Memorandum, if feasible. Within ten (10) calendar days of implementation, the former Facility SWPPP shall be amended to include all additional BMP measures designated in the Action Memorandum. ERF may review and comment on an Action Memorandum within thirty (30) days of receipt, and suggest any additional pollution prevention measures it believes are appropriate; however, ERF's failure to do so shall not be deemed to constitute agreement with the proposals set forth in the Action Memorandum. Upon request by either Party, ERF and SPI agree to meet and confer regarding the contents and sufficiency of the Action Memorandum.

6. **Inspections During The Term Of This Agreement**. SPI shall permit representatives of ERF to perform one (1) physical inspection of the former Facility during the term of this Agreement. This inspection shall be performed by ERF's counsel and consultants and may include sampling, photographing, and/or videotaping (ERF agrees photographing and videotaping will be keep confidential, except as necessary for enforcement or dispute resolution under this Agreement) and ERF shall provide SPI with a copy of all sampling reports, photographs, and/or video. ERF shall provide at least seventy-two (72) hours advance notice of such physical inspection, except that SPI shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals. In such case, SPI shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by ERF may proceed. SPI shall not make any alterations to former Facility conditions during the period between receiving ERF's initial seventy-two (72) hour advance notice and

---

[3] *See, supra*, footnote 1.

the start of ERF's inspection that SPI would not otherwise have made but for receiving notice of ERF's request to conduct a physical inspection of the former Facility, excepting any actions taken in compliance with any applicable laws or regulations. Nothing herein shall be construed to prevent SPI from continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by ERF or at any time.

7.      **Agreement to Inform**.  SPI agrees to inform ERF of any known proposed site development, including demolition or construction activity, or any known new activities where disturbance of on-site sediment will occur.

8.      **Notice of Termination**.  SPI agrees not to submit any Notice of Termination of coverage under the General Permit for the former Facility during the term of this Agreement except as provided herein. SPI may submit a Notice of Termination of coverage under the General Permit for the former Facility following the 2017-2018 reporting year (ending June 30th of 2018) only if QSE samples taken in the 2017-2018 reporting year, or a reporting year thereafter, are below the maximum values set forth in Exhibit C, below.

9.      **Termination of Consent Decree in Case No. C-01-0520 MEJ**.  Within ten (10) days of notification that the Regional Board or its staff has approved a Notice of Termination submitted pursuant to Paragraph 8, above, the Parties agree to file, in *Ecological Rights Foundation v. Sierra Pacific Industries* (N.D. Cal. Case No. C-01-0520 MEJ), a motion to terminate the Consent Decree lodged and ordered in that case.

10.     **SPI Communications To/From Regional and State Water Boards.** During the term of this Agreement, SPI shall provide ERF with copies of all documents submitted to, or received from, the Regional Water Board or the State Water Board concerning storm water discharges from the former Facility, including, but not limited to, all documents and reports submitted to the Regional Board and/or State Water Board as required by the current General Permit.  Such documents and reports shall be provided to ERF pursuant to the Notice provisions set forth below and contemporaneously with SPI's submission(s) to, or, receipt from, such agencies. Documents uploaded to the State's SMARTS database do not have to be separately provided to ERF.

11.     **SWPPP Amendments**. Pursuant to the Notice provisions set forth below, SPI shall

1  provide ERF with a copy of any amendments to the former Facility SWPPP made during the term of

2  the Agreement within fourteen (14) calendar days of such amendment.

3  **II.     MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS**

4         **12.     Mitigation Payment In Lieu Of Civil Penalties**. As mitigation to address any potential

5  harm from the Clean Water Act violations alleged in ERF's Complaint, SPI agrees to pay the sum of

6  $10,000.00 to the Rose Foundation for Communities and the Environment ("Rose Foundation") for

7  projects to improve water quality in the Mad River Slough and/or Humboldt Bay. Such mitigation

8  payment shall be remitted directly to the Rose Foundation at: Rose Foundation, Attn: Tim Little, 1970

9  Broadway, Suite 600, Oakland, CA 94612 within fifteen (15) calendar days of the Court Approval

10 Date. ERF agrees it is prohibited from accepting any award from the Rose Foundation that includes

11 monies from this mitigation payment.

12        **13.     Reimbursement of Fees & Costs**. SPI agrees to reimburse ERF in the amount of

13 $60,000 to defray ERF's reasonable investigative, expert, consultant, and attorneys' fees and costs, and

14 all other costs incurred as a result of investigating the activities at the former Facility, preparing the

15 Notice Letter and Action, negotiating a resolution of this action in the public interest, and monitoring

16 and enforcing SPI's compliance with this Agreement (excepting any future judicial enforcement as

17 prescribed in Paragraph 14), including participating in any potential changes to compliance

18 requirements herein. Such payment shall be made payable to the "Aqua Terra Aeris Law Group" and

19 remitted to the firm within seven (7) calendar days after the Court Approval Date.

20 **III. DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

21        **14.     With the exception of the specific timelines set forth above for addressing exceedances of

22 values specified in Exhibit C and Action Memoranda, if a dispute under this Agreement arises, or either

23 Party believes that a breach of this Agreement has occurred, the Parties shall meet and confer within

24 seven (7) calendar days of receiving written notification from the other Party of a request for a meeting

25 to determine whether a breach has occurred and to develop a mutually agreed upon plan, including

26 implementation dates, to resolve the dispute. If the Parties fail to meet and confer, or the meet-and-

27 confer does not resolve the issue, after at least seven (7) calendar days have passed after the meet-and-

28 confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under

1   the law, including filing a motion with the District Court of California, Northern District, which shall

2   retain jurisdiction over the Action until the Termination Date for the limited purposes of enforcement

3   of the terms of this Agreement. The Parties shall be entitled to seek fees and costs incurred in any such

4   motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the then-

5   applicable federal Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable

6   case law interpreting such provisions.

7       **15.    ERF's Waiver and Release.** Upon the Effective Date of this Agreement, ERF, on its

8   own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents,

9   attorneys, representatives, and employees, releases SPI and its officers, directors, employees,

10  shareholders, parents, subsidiaries, predecessors, successors (excepting the successor landowner of the

11  former Facility for the successor's own activities), and assigns, and affiliates, and each of their agents,

12  attorneys, consultants, and other representatives, including those named in the Notice Letter and/or

13  Action, (each a "Released Defendant Party") from, and waives all claims which arise from or pertain to

14  the Notice Letter and/or Action, including, without limitation, all claims for injunctive relief, damages,

15  penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs,

16  expenses or any other sum incurred or claimed or which could have been claimed, for the alleged

17  failure of SPI to comply with federal and state law, including the federal Clean Water Act (33 U.S.C.

18  sections 1251, *et seq*.), at the former Facility, up to the Termination Date, with the exception of matters

19  addressed in Paragraph 14.

20      **16.    SPI's Waiver and Release.** SPI, on its own behalf and on behalf of any Released

21  Defendant Party under its control, releases ERF (and its officers, directors, employees, members,

22  parents, subsidiaries, and affiliates, and each of its successors and assigns, and its agents, attorneys, and

23  other representative) from, and waives all claims which arise from or pertain to the Notice Letter and/or

24  Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses

25  or any other sum incurred or claimed or which could have been claimed for matters associated with or

26  related to the Notice Letter and/or Action, with the exception of matters addressed in Paragraph 14.

27      **17.    ERF's Covenant Not to Sue.** Except for the enforcement of this Agreement, beginning

28  on the Effective Date and terminating on the Termination Date, ERF agrees that neither ERF, its

officers, executive staff, members of its governing board nor any organization under the control of

ERF, its officers, executive staff, or members of its governing board, will serve any 60-day Notice

Letter or file any lawsuit against the SPI seeking relief for all claims regarding the alleged failure of

SPI to comply with the federal Clean Water Act (33 U.S.C. sections 1251, *et seq.*), at the former

Facility including, without limitation, all claims for injunctive relief, damages, penalties, fines,

sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any

other sum, incurred or claimed or which could have been claimed related thereto. Any such 60- day

Notice Letter or lawsuit filed by ERF after the Termination Date shall not include any such claims for

such alleged actions occurring up to and including the Termination Date.

       **18.**    The Parties acknowledge that they are familiar with section 1542 of the California Civil

Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist
> in his favor at the time of executing the release, which if known by him must have materially
> affected his settlement with the debtor.

While ERF asserts that California Civil Code section 1542 applies to general releases only, and that the

release in Paragraph 15 above is a limited release, the Parties hereby waive and relinquish any rights or

benefits they may have under California Civil Code section 1542 with respect to any other claims

against each other arising from, or related to, the allegations and claims as set forth in the Notice Letter

and/or the Action, up to and including the Effective Date of this Agreement.

**IV. MISCELLANEOUS PROVISIONS**

       **19.**    The Parties enter into this Agreement for the purpose of avoiding prolonged and costly

litigation. Nothing in this Agreement shall be construed as, and SPI expressly does not intend to imply,

an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this

Agreement constitute or be construed as an admission by SPI of any fact, finding, conclusion, issue of

law, or violation of law. However, this paragraph shall not diminish or otherwise affect the obligation,

responsibilities, and duties of the Parties under this Agreement.

       **20.**    This Agreement shall be effective upon mutual execution by all Parties (the "Effective

Date"). The Agreement shall terminate upon the Regional Board staff approval of the Notice of

Termination submitted pursuant to Paragraph 8, above and termination of the Consent Decree in *Ecological Rights Foundation v. Sierra Pacific Industries* (N.D. Cal. Case No. C-01-0520 MEJ), as described in Paragraph 9, above, whichever is later. (the "Termination Date").

21.     The terms of this Agreement shall be binding on all parties and their employees, officers, agents, divisions, subsidiaries, parent corporations, affiliates, successors in interest including subsequent purchasers, and assignees.

22.     The Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Agreement shall be valid as an original.

23.     In the event that any one of the provisions of this Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

24.     The language in all parts of this Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning. This Agreement shall be construed pursuant to California law, without regarding to conflict of law principles.

25.     The undersigned are authorized to execute this Agreement on behalf of their respective Parties and have read, understood, and agreed to be bound by all of the terms and conditions of this Agreement.

26.     All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Agreement are contained herein. This Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Agreement, unless otherwise expressly provided for therein.

27.     **Notices**. Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to ERF pursuant to this Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Fredric Evenson
> Director, Ecological Rights Foundation
> P.O. Box 1000

Santa Cruz, CA 95061-1000
evenson@ecologylaw.com

With copies sent to:

Jason R. Flanders
Aqua Terra Aeris Law Group
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
jrf@atalawgroup.com

Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to SPI pursuant to this Agreement shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

Jeremy Higgins
Environmental Manager
Sierra Pacific Industries
19758 Riverside Avenue
Anderson CA 96080
jhiggins@spi-ind.com

With copies sent to:

Nicole E. Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
ngranquist@downeybrand.com

David Dun
Dun & Martinek
2313 I Street
Eureka, CA 95501
dhd@dunmartinek.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

28.    Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

29.    No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure". A Force Majeure event is any circumstances beyond the Party's control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority. A Force Majeure event does not include normal

inclement weather, such as anything less than or equal to a 100-year/24-hour storm event, or inability to pay. Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid and which by exercise of due diligence has been unable to overcome, the Force Majeure.

30.   If for any reason the District Court should decline to approve this Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Agreement within thirty (30) calendar days so that it is acceptable to the District Court. If the Parties are unable to modify this Agreement in a mutually acceptable manner, this Agreement shall become null and void.

31.   This Agreement shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Party on the ground that any such Party drafted it.

32.   This Agreement and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Agreement, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings and communications of the Parties, whether oral or written, respecting the matters covered by this Agreement. This Agreement may be amended or modified only by a writing signed by the Parties or their authorized representatives.

Ecological Rights Foundation

Date: August 25, 2017

By:  Fredric Evenson, Director

Sierra Pacific Industries, Inc.

Date: 9/5/17

By:   George Emmerson

Approved as to Form

Date: August 23, 2017                    AQUA TERRA AERIS LAW GROUP

                                         By:    Jason R. Flanders
                                                Attorney for Plaintiff ERF

Date: Sept. 5, 2017                      DOWNEY BRAND LLP

                                         By:    Nicole E. Granquist
                                                Attorney for Defendant SPI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**



## Site Map
### Sierra Pacific Industries — Arcata Division

**Legend:**
- ✳ Stormwater Sampling Location
- Drainage Channel
- DD #1  Drainage Ditch Number
- Structural Control Berm
- Pervious Area
- Drainage Area
- ● Normally Closed Discharge Point
- ⁃⁃⁃ Approximate Facility Boundary
- Road
- ⁃ ⁃ Underground Stormwater Pipe/Culvert
- Vegetated Drainage Ditch
- Aboveground Stormwater Pipe
- ⇨ Surface Flow Direction
- Drop Inlet
- Oil/Water Separator

Approx. Scale: 1 : 1,850

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## EXHIBIT B



November 10, 2016

<u>VIA U.S. CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

Jerry E. Kelley                          David H. Dun
Division Manager                   Agent for Service
Sierra Pacific Industries        Sierra Pacific Industries
PO Box 1189                          2313 I Street
Arcata, CA 95518                   Eureka, CA 96049

RE:   **REQUEST FOR MEET AND CONFER / NOTICE OF VIOLATIONS AND
INTENT TO FILE SUIT UNDER THE FEDERAL WATER POLLUTION
CONTROL ACT ("CLEAN WATER ACT") (33 U.S.C. §§ 1251 *et seq.*)**

Dear Mr. Kelley,

This firm represents the Ecological Rights Foundation ("ERF"), a California non-profit corporation dedicated to protecting California's waterways from pollution, including Humboldt Bay, and its tributary, the Mad River Slough. This letter is being sent to you as the responsible owners, officers, and/or operators of the Sierra Pacific Industries' ("SPI") Arcata Division Sawmill located at, near, or adjacent to 2593 New Navy Base Road, California General Industrial Storm Water Permit waste discharger identification number 1 12I000440 (the "Facility"), regarding ongoing violations of the Clean Water Act 33 U.S.C. § 1251 *et seq.* ("CWA" or "the Act"); and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 ("General Permit"), Water Quality Order No. 97-03-DWQ ("1997 General Permit"), as superseded by Order No. 2015-0057-DWQ ("2015 General Permit") occurring at the Facility.[1] The CWA requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the

---

[1] The 1997 General Permit was in effect between 1997 and June 30, 2015, and the 2015 General Permit went into effect on July 1, 2015. As will be explained below, the 2015 General Permit includes many of the same fundamental requirements, and implements many of the same statutory requirements, as the 1997 General Permit. Violations of the General Permit constitute ongoing violations for purposes of CWA enforcement. 2015 General Permit, Finding A.6.

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 2 of 15



Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. 135.2.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects SPI to a penalty of up to $37,500 per day, per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violation and Intent to File Suit. In addition to civil penalties, ERF will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) of the Act (33 U.S.C. §§ 1365(a), (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees including attorneys' fees.

In addition, SPI is subject to the terms of the Consent Decree entered March 14, 2003 in *Ecological Rights Foundation v. Sierra Pacific Industries Inc.* (Case No. C-01-0520-MEF) ("Consent Decree"). SPI's continued discharge of pentachlorophenol, chlorinated dibenzodioxins and chlorinated dibenzofurans, among other acts and omissions, constitute violations of the Consent Decree. Pursuant to Consent Decree paragraph 32, ERF seeks to meet and confer with SPI within 20 days to resolve these violations. If SPI and ERF cannot come to a resolution, ERF will bring this dispute to the Court for a final and binding determination.

As required by the Act, and the Consent decree, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a), and request to meet and confer within 20 days as to violations of the Consent Decree. At the expiration of sixty (60) days from the date of this letter, ERF intends to file suit under Section 505(a) of the Act (33 U.S.C. § 1365(a)) in federal court against Sierra Pacific Industries for violations of the Act and the General Permit at the Facility, and to seek judicial relief from SPI's ongoing Consent Decree breach.

## I.   Background

### A.   The Clean Water Act

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003)

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 3 of 15



(describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation of a NPDES permit, is illegal. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers, as well as through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342.

## B.     California's General Permit for Storm Water Discharges Associated with Industrial Activities

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ, which ERF refers to as the "1997 General Permit." On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit. For the purposes of this notice letter, ERF refers to the reissued permit as the "2015 General Permit." The 2015 General Permit rescinded in whole the 1997 General Permit, except for the expired permit's requirement that annual reports be submitted by July 1, 2015, and for purposes of CWA enforcement. 2015 General Permit, Finding A.6.

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). 1997 General Permit, Provision E.1; 2015 General Permit, Standard Condition XXI.A. Facilities must file their NOIs before the initiation of industrial operations. *Id.*

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA. The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

## B.     Applicable CWA Standards

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 4 of 15



CWA § 402 requires each discharger to meet minimum technology-based treatment requirements. Discharges of toxic pollutants must be treated pursuant to the best available technology ("BAT"), 33 U.S.C. § 1311 (b)(2)(A), and other pollutant discharges must comply with best conventional technology ("BCT"). 33 U.S.C. § 1311(b)(2)(E). In addition to implementing technology-based controls, each point source discharger must achieve "any more stringent limitation necessary to meet water quality standards[.]" 33 U.S.C. § 1311(b)(1)(C). Water quality standards establish the water quality goals for a water body. 40 C.F.R. § 131.2. They serve as the regulatory basis for the establishment of water quality-based controls over point sources, as required under § 301 and § 306 of the CWA. Once water quality standards are established for a particular water body, any NPDES permit authorizing discharges of pollutants into that water body must ensure that the applicable water quality standard will be met. 33 U.S.C. § 1311 (b)(l)(C); 40 C.F.R. §§ 122.4(d), 122.4(i), 122.44(d).

In turn, the General Permit requires that storm water discharges and authorized non-storm water discharges be treated to meet BAT/BCT (1997 Permit, Finding 10, 2015 Permit I.A.1) and shall not cause or threaten to cause pollution, contamination, or nuisance (1997 General Permit, Discharge Prohibition A.2; 2015 General Permit, Discharge Prohibition III.C). The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies. 1997 General Permit, Receiving Water Limitation C.2; 2015 General Permit, Discharge Prohibition III.D. Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. 1997 General Permit, Receiving Water Limitations C.1, C.2; 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. 1997 General Permit, p. VII; 2015 General Permit, Special Condition XX.B. The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id.*

Beneficial uses (and water quality objectives to protect those uses) are included in the General Permit's definition of "water quality standard" (see Attachment C). The Basin Plan identifies present and potential beneficial uses for Humboldt Bay, including municipal and domestic supply, industrial service supply, navigation, commercial and sport fishing, preservation of rare and endangered species, wildlife habitat, marine habitat, estuarine habitat, aquaculture, migration, shellfish harvesting, and contact and non-contact water recreation. The General Permit requires compliance with receiving

4

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 5 of 15



water limitations, which includes ensuring that discharges do not contribute to exceedances of standards (General Permit, parts I.D, V). The General Permit also clarifies that "if any individual facility's storm water discharge causes or contributes to an exceedance of a water quality standard, that Discharger must implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation".

The Basin Plan also sets forth water quality standards and prohibitions applicable to SPI's storm water discharges, providing that storm water discharges must not "cause adverse effects on the beneficial uses of the receiving water" (Basin Plan, § 4-12.00). Humboldt Bay does not have TMDLs, but in 2006 the hydrologic unit it is part of was been listed under s 303(d) for the following impairments: polychlorinated biphenyls, dioxin toxic equivalents, sediment, and sedimentation / siltation. The 303(d) impairment listing for Humboldt Bay in respect of dioxins and PCPs means that the Bay already contains these pollutants at levels that exceed protective water quality criteria and standards. Therefore, any additional dioxins in the water will further impair beneficial uses, violating water quality standards and the General Permit. This is of particular concern here given that dioxins are persistent environmental pollutants, and bio-accumulative.

Similarly, the discharge of dioxins violates the general Basin Plan objective that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life" (Basin Plan, § 3-4.00). The EPA considers there is no safe level of dioxin exposure; for instance, the maximum contaminant level goal in the primary drinking water standards for dioxin (2,3,6,8-TCDD) is zero. Dioxins are harmful to both humans and aquatic life; in Humboldt Bay there is a particular risk of contamination in shellfish and fish.

The California Toxics Rule (40 CFR § 131.38) is an applicable water quality standard under the Permit, violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.,* 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015). Numeric criteria for pentachlorophenol are listed in the California Toxics Rule. The "Criteria Maximum Concentration" for saltwater is 13 ug/L, 0.28 ug/L for human health (for consumption of water + organisms), and 8.2 ug/L for consumption of organisms only. The CTR states that the EPA has assigned human health, water & organism consumption criteria, to waters with the states' municipal or ''MUN'' beneficial use designation in the Basin Plan (65 CFR 31687). This level is applicable to discharges to Humboldt Bay because its beneficial uses, as designated in the Basin Plan, include "Municipal and Domestic Supply" (MUN) and "Shellfish Harvesting" (SHELL).

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 6 of 15



Finally, the SWRCB's "Policy for Implementation of Toxics Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California" (2005) states that dischargers must be required to report levels of 17 specified chlorinated dibenzodioxins (2,3,7,8-CDDs) and chlorinated dibenzofurans (2,3,7,8-CDFs), and the sum of their respective Toxic Equivalence Factor values.

### C.    SPI's Arcata Facility

SPI's industrial facility at Arcata is located on a 70-acre site. The site was developed into a sawmill in around 1950 that operated until early 2016. The Mad River Slough, which is connected to Humboldt Bay, borders the eastern side of the Facility. The industrial part of the Facility consists of a sawmill, log yard, lumber yard, boiler, retention pond, log deck, historical dip tank area, and various storage and oil sheds. There are seven distinct drainage areas and seven sampling points identified on the site map; six of these drainage areas are covered by the General Permit, with the remaining area subject to a separate Individual Permit. The industrial activities of the Facility fall under Standard Industrial Classification ("SIC") 2421, Sawmills and Planing Mills, General.

The Facility discharges water under the General Permit east to the Mad River Slough, which is connected to Humboldt Bay, and west to a wetland that drains into the Bay. The Mad River Slough and Humboldt Bay are waters of the United States within the meaning of the CWA. SPI Arcata is discharging pursuant to California's General Permit for Storm Water Discharges Associated with Industrial Activities (General Permit) Order 2014-0057-DWQ. The General Permit regulates approximately 33 acres of the industrial activity area. SPI Arcata filed its Notice of Intent (NOI) to comply with the General Permit on or around May 4, 2015. There is also an Individual NPDES permit regulating storm water and log deck sprinkle discharges over an 8.5-acre area (Order No. R1-2002-0042; NPDES Permit No. CA0024520).

In October 2001 the California Regional Water Quality Control Board, North Coast Region (the "Regional Board"), found that the Facility's storm water runoff and underlying groundwater were contaminated with pentachlorophenol and tetrachlorophenol. These chemicals were used in wood preservatives that had been stored in the historic dip tank, and continued to run off in storm water and leach into the groundwater after SPI Arcata discontinued their use in 1985. The Regional Board issued a Cleanup and Abatement Order (No. R1-2001-0200) (the "2001 Order"), noting that these discharges were in violation of the *Water Quality Control Plan for the North Coast Region* (the "Basin Plan").  The 2001 Order required the Facility to "abate the discharges of petroleum hydrocarbons, pentachlorophenol, tetrachlorophenol, and any other toxic compounds to Mad River Slough and groundwater".

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 7 of 15



The Facility is currently subject to Clean-up and Abatement Order No. R1-2003-0127, dated November 13, 2003 (the "2003 Order"), which replaced the earlier Order. The 2003 Order reiterates the requirement to abate discharges of petroleum hydrocarbons, pentachlorophenol, tetrachlorophenol, and any other toxic compounds, and imposes reporting and monitoring requirements on SPI Arcata.

### D.   Enforcement Action by ERF

On January 31, 2001, ERF filed a complaint against SPI alleging that it had illegally discharged contaminated storm water from the Arcata Facility into the Mad River Slough and Humboldt Bay, and had failed to use "best available technology" and "best conventional technology" to control its discharge of pollutants or develop and implement an adequate SWPPP or Storm Water Monitoring and Reporting Program. On October 29, 2002, the United States District Court for the Northern District of California granted ERF's motion for partial summary judgment. The Court found that no genuine issues of material fact existed in respect of each of ERF's claims, and that SPI had violated the Clean Water Act each day since October 25, 1995.

The litigation was finally resolved when the parties agreed to a Consent Decree on March 14, 2003. ERF was given oversight of the regulatory investigation and remediation plans addressing contamination at the Arcata Facility (§ 11). Under the Consent Decree, SPI must:

- Remediate residual wood treatment chemicals in soil and groundwater at the Arcata Facility (§ 14).
- Comply with applicable waterboard orders (§§ 11, 15).
- Implement and maintain a storm water monitoring program in compliance with the Clean Water Act General Permit (§ 16).
- Prepare a revised SWPPP in compliance with the General Permit, which must provide for the implementation of Best Management Practices (BMPs) to reduce or eliminate the discharge of sawdust, petroleum, metals, PCP, TCP dioxins and furans (§ 17).
- Undertake remediation of pollution in the marine sediment of the Mad River Slough, to the extent that pollution is found to be caused by SPI (§ 24).

If any dispute arises under the Consent Decree, the parties are to meet and confer in good faith to resolve the dispute (§ 32). If the parties are unable to resolve the dispute, the District Court retains jurisdiction to make a final and binding determination.

## III.   SPI's Violations of the Act and the General Permit

Based on its review of available public documents, ERF is informed and believes that SPI is in ongoing violation of both the substantive and procedural requirements of

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 8 of 15



the CWA, and the General Permit. These violations are ongoing and continuous. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the CWA, SPI is subject to penalties for violations of the Act since November 10, 2011.

Contaminated storm water and non-storm water discharges can and must be controlled for the Humboldt County and North Coastal Basin ecosystem to regain and maintain its health. Information available to ERF indicates that certain industrial operations at the Facility are conducted outdoors without adequate cover or containment to prevent non-storm water and storm water exposure to pollutant sources or direct discharge of pollutants via air deposition into surface waters.

SPI's storm water sampling results provide conclusive evidence of its failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations. Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988). Based on SPI's own reports, ERF alleges that such violations occur each time storm water discharges from the Facility. Attachment A hereto, sets forth the specific rain dates on which ERF alleges that SPI has discharged storm water containing impermissible levels of pentachlorophenol and dioxins, in violation of the General Permit. 1997 General Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2; 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

The following sample results demonstrate discharges of pollutants from the Facility have violated the discharge prohibitions and receiving water limitations.

### a.   Discharge of Storm Water Containing Pentachlorophenol at Concentrations in Excess of Applicable CTR Value

| Date | Parameter | Discharge Point | Result (ug/L) | CTR limit for aquatic life (ug/L) | CTR limit for human health- water + organisms (ug/L) |
|---|---|---|---|---|---|
| 11/19/2015 | Pentachlorophenol | SL-1 | 0.35 | 13 | 0.28 |
| 12/9/2015 | Pentachlorophenol | SL-7 | 0.7 | 13 | 0.28 |
| 12/9/2015 | Pentachlorophenol | SL-1 | 0.41 | 13 | 0.28 |
| 1/13/2016 | Pentachlorophenol | SL-7 | 0.4 | 13 | 0.28 |

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 9 of 15



### b.   Discharges of Storm Water Containing Chlorinated Dibenzodioxins and Chlorinated Dibenzofurans

| Date | Parameter | Discharge Point | Result (pg/L) | TEQ[2] |
|---|---|---|---|---|
| 12/8/2015 | 1,2,3,4,6,7,8,9-Octachlorodibenzo-p-dioxin | SL-4 | 274 | 0.0274 |
| 12/8/2015 | 1,2,3,4,6,7,8-Heptachlorodibenzo-p-dioxin | SL-4 | 42.3 | 0.423 |
| *Total TEQ  for sample = 0.4504* | | | | |
| 12/9/2015 | 1,2,3,4,6,7,8,9-Octachlorodibenzofuran | SL-7 | 1940 | 0.194 |
| 12/9/2015 | 1,2,3,4,6,7,8,9-Octachlorodibenzo-p-dioxin | SL-7 | 9390 | 0.939 |
| 12/9/2015 | 1,2,3,4,6,7,8-Heptachlorodibenzofuran | SL-7 | 461 | 4.61 |
| 12/9/2015 | 1,2,3,4,6,7,8-Heptachlorodibenzo-p-dioxin | SL-7 | 1600 | 16 |
| 12/9/2015 | 1,2,3,4,7,8-Hexachlorodibenzofuran | SL-7 | 38.1 | 3.81 |
| 12/9/2015 | 1,2,3,4,7,8-Hexachlorodibenzo-p-dioxin | SL-7 | 50.5 | 5.05 |
| 12/9/2015 | 1,2,3,6,7,8-Hexachlorodibenzofuran | SL-7 | 17.6 | 1.76 |
| 12/9/2015 | 1,2,3,6,7,8-Hexachlorodibenzo-p-dioxin | SL-7 | 53.3 | 5.33 |
| 12/9/2015 | 1,2,3,7,8,9-Hexachlorodibenzo-p-dioxin | SL-7 | 60.6 | 6.06 |
| 12/9/2015 | 2,3,4,6,7,8-Hexachlorodibenzofuran | SL-7 | 25.1 | 2.51 |
| *Total TEQ  for sample = 46.263* | | | | |
| 12/17/2015 | 1,2,3,4,6,7,8,9-Octachlorodibenzo-p-dioxin | SL-7 | 252 | 0.0252 |
| 12/17/2015 | 1,2,3,4,6,7,8-Heptachlorodibenzofuran | SL-7 | 35.4 | 0.354 |

---

[2]  TEQ calculations are based on the methodology set out in the EPA's Rule on Dioxin and Dioxin-Like Compounds, Toxic Equivalency Information (72 FR 26545; 40 CFR Part 372).

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 10 of 15



| 12/17/2015 | 1,2,3,4,6,7,8-Heptachlorodibenzo-p-dioxin | SL-7 | 60 | 0.6 |
|---|---|---|---|---|
| Total TEQ  for sample = 0.9792 | | | | |
| 12/18/2015 | 1,2,3,4,6,7,8,9-Octachlorodibenzofuran | SL-7 | 236 | 0.0236 |
| 12/18/2015 | 1,2,3,4,6,7,8,9-Octachlorodibenzo-p-dioxin | SL-7 | 1930 | 0.193 |
| 12/18/2015 | 1,2,3,4,6,7,8-Heptachlorodibenzofuran | SL-7 | 103 | 1.03 |
| 12/18/2015 | 1,2,3,4,6,7,8-Heptachlorodibenzo-p-dioxin | SL-7 | 380 | 3.8 |
| 12/18/2015 | 1,2,3,6,7,8-Hexachlorodibenzo-p-dioxin | SL-7 | 31.5 | 3.15 |
| Total TEQ  for sample = 8.1966 | | | | |
| 1/13/2016 | 1,2,3,4,6,7,8,9-Octachlorodibenzofuran | SL-7 | 63.6 | 0.00636 |
| 1/13/2016 | 1,2,3,4,6,7,8,9-Octachlorodibenzo-p-dioxin | SL-7 | 422 | 0.0422 |
| 1/13/2016 | 1,2,3,4,6,7,8-Heptachlorodibenzofuran | SL-7 | 28.4 | 0.284 |
| 1/13/2016 | 1,2,3,4,6,7,8-Heptachlorodibenzo-p-dioxin | SL-7 | 84.2 | 0.842 |
| Total TEQ  for sample = 1.17456 | | | | |
| 1/28/2016 | 1,2,3,4,6,7,8,9-Octachlorodibenzo-p-dioxin | SL-7 | 427 | 0.0427 |
| 1/28/2016 | 1,2,3,4,6,7,8-Heptachlorodibenzo-p-dioxin | SL-7 | 82 | 0.82 |
| Total TEQ  for sample = 0.8627 | | | | |

### c. SPI's Sample Results Are Evidence of Violations of the General Permit and Abatement Order

SPI's sample results demonstrate violations of the General Permit's discharge prohibitions, receiving water limitations, and effluent limitations set forth above. This contamination has occurred, and is occurring, because industrial materials and/or activities are exposed to storm water at the Arcata Facility. ERF is informed and believes that the SPI has known that its storm water contains pollutants at levels

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 11 of 15



exceeding General Permit standards since at least November 10, 2011. Moreover, SPI Arcata is in breach of the terms of the 2003 Order because it has not abated pentachlorophenol discharges.

### d.  SPI Has Failed to Implement BAT and BCT

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* 1997 General Permit, Sections A.8.a-b; 2015 General Permit, Sections X.H.1-2.

Based on its self-reported monitoring results, SPI has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. 1997 General Permit, Sections A.8.a(i–x); 2015 General Permit, Sections X.H.1(a–g).

Based on its self-reported monitoring results, SPI has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. 1997 General Permit, Section A.8.b; 2015 General Permit, Sections X.H.2.

Each day the Owners/Operators have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA (33 U.S.C. § 1311(a)). The violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit. Accordingly, the Owners/Operators have been in violation of the BAT and BCT requirements at the Facility every day since at least November 10, 2016.

### e.  SPI Has Failed to Develop and Implement an Adequate Storm Water Pollution Plan

The General Permit requires dischargers to develop and implement a site-specific SWPPP. 1997 General Permit, Section A.1; 2015 General Permit, Section X.A.

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 12 of 15



The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. 2015 General Permit, Section X.B; see also 1997 General Permit, Section A.

ERF's investigation indicates that SPI has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements. SPI has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous effluent limitation violations.

Each day the Owners/Operators failed to develop and implement an adequate SWPPP is a violation of the General Permit. The SWPPP violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit. The Owners/Operators have been in violation of these requirements at the Facility every day since at least November 10, 2016.

## III.   SPI's Violations of the Consent Decree

SPI's recent storm water sampling results for the Arcata Facility continue to record concerning levels of pentachlorophenol, dioxins and furans (see III(a)-(b) below) evidencing breach of several Consent Decree provisions.

First, the Consent Decree requires remediation to achieve compliance with the terms of the 2001 Order. As noted above, the 2001 Order, and the 2003 Order that followed it, mandates that SPI abate the discharges of petroleum hydrocarbons, pentachlorophenol, tetrachlorophenol, and any other toxic compounds to Mad River Slough and groundwater. SPI has not abated these discharges, as evidence by its storm water sampling results herein, placing SPI in breach of §§ 11 and 14 of the Consent Decree.

Second, a SPI has failed to implement a monitoring and reporting program, and a SWPPP, that complies with the CWA. As noted by the Consent Decree, and as discussed, above, the purpose of these measures is to formulate and implement BMPS that reduce or eliminate the discharge of contaminants. (*See*, *infra*, § III(e).) The

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 13 of 15



continued discharge of contaminated storm water suggests that the BMPs set out in the SWPPP are not adequate for this purpose, placing SPI in breach of §§ 16-17 of the Consent Decree.

Finally, SPI's continuing discharge of residual wood treatment chemicals negates and is contrary to SPI's obligations to remediate sediments and environs already contaminated by SPI's discharges, in violation of Consent Decree § 24.

## IV.     Persons Responsible for the Violations

ERF puts SPI on notice that it is the entity responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, ERF puts SPI on formal notice that it intends to include those persons in this action.

## V.     Name and Address of Noticing Party

The name, address, and telephone number of the noticing party is as follows:

Fredric Evenson
Director, Ecological Rights Foundation
867 Redwood Dr,
Garberville, CA 95542
(831) 454-8216
http://www.ecorights.org/

## VI.     Counsel

ERF has retained legal counsel to represent it in this matter. Please direct all communications to:

Jason R. Flanders
Sarah M.K. Hoffman
AQUA TERRA AERIS (ATA) LAW GROUP
828 San Pablo Ave, Ste 115B
Albany, CA 94706
(916) 202-3018

## VI.     Conclusion

ERF requests a meeting with SPI within 20 days to confer regarding SPI's breaches of the Consent Decree. In the event an agreement cannot be reached, ERF intends to invoke the jurisdiction of the District Court to resolve this dispute.

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 14 of 15



Further, ERF believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the CWA against Sierra Pacific Industries for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next twenty (20) days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

_____
Jason R. Flanders
ATA Law Group
Counsel for ERF

Request to Meet and Confer /
CWA Notice of Intent to Sue
SPI Arcata
November 10, 2016
Page 15 of 15



## SERVICE LIST

## VIA U.S. CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Alexis Straus, Acting Regional
Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, CA 94105

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Matthias St John, Executive Officer
North Coast Regional Water Quality
Control Board
5550 Skyline Blvd, Ste A
Santa Rosa, CA 95403

Loretta E. Lynch, Attorney-General of the
United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

## EXHIBIT C

| Parameter | Maximum Single Sample (SL-7, and average of SL-1 and SL-4) | Action Memorandum Evaluation Levels |
|---|---|---|
| Pentachlorophenol | 0.28 ug/L | 0.28 ug/L |
| 2,3,7,8 TCDD (Dioxin & Furans) | $2.8 \times 10^{-8}$ ug/L | 0.28 pg/L |